## ILLINOIS CENT. R. Co. *v.* RAY.

(Division B. May 8, 1933. Suggestion of Error Overruled June 5, 1933.)

[148 So. 233. No. 30608.]

Burch, Minor & McKay, of Memphis, Tennessee, and Creekmore & Creekmore, of Jackson, for appellant.

888

George T. and Chas. S. Mitchell, of Tupelo, for appellee.

Argued orally by **H. H. Creekmore**, for appellant, and by **George T. Mitchell**, for the appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

The declaration in this suit was in two counts against both the Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company; and, on the trial, the second count was abandoned and a nonsuit taken as to the Yazoo & Mississippi Valley Railroad Company.

It was alleged that the appellant was engaged in interstate commerce on April 3, 1932, on which date the plaintiff's intestate was killed in the south yards of the railroad company at Memphis, Tennessee; that the plaintiff's intestate was a car inspector and repairman, whose duties required him to assist in switching, classifying, handling, inspecting, and repairing cars in the yards. That, under the instructions of his foreman, about 9 o'clock on said date, he went to a car that had just been

switched on track No. 2 in the said yards, and was inspecting it, and that such inspection showed a coupler on the south end thereof to be defective and inoperative; that he began to repair the coupler, but before going on the track at the south end of the car, according to custom, he gave the usual and proper notice of his said intention to the employees of the railroad company engaged in switching operations at that point. It was further alleged that an insufficient number of car men were employed, and that the plaintiff's intestate was required to work very hurriedly and to repair cars on the track without interfering with switching operations; that it was the duty of the switchmen not to let any cars be kicked on track No. 2, they well knowing the dangerous position of Ray at the end of the car, but that they opened the switch to track No. 2 and let two other cars come in on that track at a high and dangerous rate of speed, so that the said two cars collided violently with the car on which Ray was working, causing injuries which resulted in his death. It was further alleged that it was the established custom for switchmen to ascertain whether car inspectors or repairmen were engaged in work on the tracks in the yard before kicking cars on said track; that all the switchmen knew that car men were required to inspect and do light repairs on cars in the yards, including track No. 2, and that it was the custom and duty of the engine and switching crews to give warning of the approach of any cars to said tracks, so that car inspectors might protect themselves; and that without regard to this duty, two cars were kicked with unnecessary and unusual force against the one on which Ray was working, causing his death.

The defendant pleaded the general issue, giving notice thereunder that the risks and dangers at the time and place mentioned in the declaration were such as were incident to the occupation of Ray; were open, obvious, and apparent, and were known to and assumed by Ray;

and gave further notice that Ray was careless and negligent in failing to observe the rules of defendant governing work at the time and place; and that such negligence contributed to and caused the injuries sustained by him.

Defendant pleaded that Ray disobeyed and ignored the following rule: "A blue flag displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it. When thus protected, it must not be coupled to or moved. The same workmen that displayed the blue signals alone are authorized to remove them. Other equipment must not be placed on the same track so as to intercept the view of the blue signal without first notifying the workmen. When emergency repair work is to be done under or about cars the engineer and firemen will be notified, and protection must be given those engaged in making the repairs."

The trial of this case resulted in a verdict for ten thousand dollars in favor of Mrs. Lorine Ray, administratrix.

No one saw Ray, the deceased, at the exact time of his injury, but a witness named James testified that he was in the south yards on the morning in question for the purpose of trying to secure a pass to a Northern point; that he talked to a man named Dye, who was in charge of the switching yards, but that Dye refused to get the pass because it was Sunday; that he (James) knew Ray and saw him approaching the car which injured him and go behind it; that almost immediately he came out from behind the car and gave Dye signals to stop further cars coming into that track, and that Dye received the signal and answered it; that he (James) knew the signals and their meaning; and that Ray's signal meant that no other cars were to be brought into said track until another signal had been given authorizing cars to come into said switch. James also testified that, while he was talking to Dye, after these signals had been given, two cars were switched into track No. 2 moving at a rapid rate, but that he went away and did not see the accident.

This witness also testified that it was the custom in switching operations to give such signals as were given by Ray and Dye instead of putting out a blue flag, and that it was not customary to display a blue flag when only slight repairs were made. The testimony of the witness, James, was contradicted by the railroad company, but was corroborated by other witnesses in many material and important respects.

Mr. Dye, the man who was doing the switching, denied that Ray gave him any signals, and that he knew Ray was behind the car at the time he was injured. He says, however, that he saw James in the yards that morning, and that another person approached him (Dye) to secure a pass, which he declined to help secure because it was Sunday, and there was an agreement that no such request would be made of the person issuing transportation on Sunday. Dye testified, in part, as follows:

"Q. Is it not a fact that minor repairs were made anywhere in that yard that they could be fixed without any great length of time,—that the car inspector would go in there and fix it without setting out a blue flag? A. I would say such as adjusting knuckle locks and putting on a hose we never used a blue flag.

"Q. In your twenty-seven years in that yard, have ever known them to use a blue flag in that yard? A. Not on light repair work, no.

"Q. How long did it take Boston to fix that knuckle? A. Not very long.

"Q. Just a minute or two? A. Yes sir.

"Q. In fixing a knuckle that would take only a minute or two to fix, they would not set out any blue flag for that on those fast tracks? A. No, they never do unless they crawl under the car. . . .

"Q. If you don't put a blue flag out while doing that kind of work, what precaution do the men take to protect themselves? A. They usually go in pairs and if the

work is dangerous, one man looks out while the other does the work.

"Q. Is there any other method of protecting themselves? A. Blue flag or light.

"Q. By the court. Do they give any stop sign? A. Sometimes they do and sometimes they never give a sign. . . .

"Q. What about the car men, did they know about the way it was done? A. Yes, sir, they should know.

"Q. This method you say they had of doing this work, did the carmen know that is the way it was customarily done? What I mean is this, say they were putting air hose on and didn't put out a blue flag and didn't notify the engine crew, the repairmen knew they had to look out for themselves, the switching crew didn't have to look out for them unless they had notice? A. If we don't have the blue flag, we don't pay any attention to anything much.

"Q. And the repair men knew that? A. Yes sir."

Other witnesses testified that they saw James in the yards that morning, and a number of witnesses testified that when only slight repairs were to be made, it was not the custom to put out a blue flag, but that signals, as testified to by the witness James, were given, which signals were answered; and that it was the duty and custom of employees receiving signals not to admit cars into the track until the repairs were finished and the signals released.

A witness by the name of R. T. McNulty, who had about twenty years experience as a switchman in the yards, testified that he was familiar with the rules and knew of the blue flag rule, and that it was an old rule, and being interrogated stated as follows:

"Q. In the twenty-two years you worked in that yard, was that blue flag rule observed? Objected to, objection overruled, counsel except. A. It was not.

"Q. Did you ever see them use a blue flag out in the

yard on those rush tracks? A. I cannot recall ever having seen a blue flag used.

"Q. Mr. McNulty, when a car inspector would find it necessary to make minor repairs on a car in track number 2, what was the custom used there with reference to signals? Objected to unless it be confined to the proximate date of the injury.

"By the court. I will let him tell that up as late as 1929. Counsel except.

"Q. In the year 1929, tell the jury what the custom was with reference to signals when a car repairer was making minor repairs on a hot track. A. If he was making minor repair or coupling the hose, he would let the switchman know he was about that work so he would be protected.

"Q. How would he let them know? A. If he was not close enough to speak to them, he would give them a signal, and would continue to signal with his hands until the flagman saw it and repeated it, and until that signal was recognized, no cars were put in there until it was, and when it was finished, he would give the high-ball to proceed.

"Q. I will ask you this, during the twenty-two years you worked there from 1907 to 1929, was the custom you have just stated in vogue? A. Yes sir."

Mr. White, a witness, testified as follows:

"Q. Are you familiar with the adjacent tracks to track number 2 in the yard of the Illinois Central Railroad? A. Yes sir.

"Q. State whether or not what is known as the blue flag rule, are you familiar with that rule? A. Yes sir.

"Q. State whether or not that rule was observed by the Illinois Central Railroad Company? A. I believe in my whole career of making deliveries—(Objected to his statement of making deliveries of cars over there. Objection overruled. Counsel except.)

"A. I never saw a blue flag over there.

"Q. Did you ever see a blue flag on the number 2 track in the yards at any time you have been over there? A. No sir. . . . .

"Q. In what way would the carmen that wanted to make an inspection of the car or make temporary repairs on the car, in what way would he give notice particularly to the switchmen that they were not to switch any cars against that car? A. First, walk out there and signal you down with his hand, if it was daytime, and if it was at night, signal you with a lantern.

"Q. Have you seen that done in the Illinois Central and The Y. & M. V. R. R. yards in the last few years? A. Many times.

"Q. Do you know that to be a custom in those yards? A. Yes sir.

"Q. When that signal is given, how was it accepted or recognized by the switchmen? A. He would signal our man down.

"Q. In other words, the same signal would be given back? Objected to as leading.

"By the Court. You would see the switchman respond to that signal? A. Yes sir.

"Q. That was the custom and practice in April of this year? Objected to, objection overruled, counsel except. A. Yes sir ever since I have been going in there.

"Q. When that signal was given and accepted in the manner described what was the duty and also practice of the switchman in regard to turning other cars in there. A. He would not go in there until he was given a sign from the car inspector.

"Q. What is a high sign? A. Highball to back up or go ahead."

It was further testified that the car which injured the deceased had a loose knuckle which was found near the place of the injury, and which it would have taken only a few minutes to have adjusted or repaired.

The principal argument by the appellant is that the

testimony to sustain the verdict is insufficient to support it; that James' testimony is wholly unreasonable and against the overwhelming weight of the evidence.

We have quoted at some length to show that it was the custom, in making minor repairs, not to put out a blue flag, but to signal.

We think the jury could well infer that the railroad company acquiesced in this practice, and that the blue flag rule was not mandatory. The terms of the rule, above quoted, are not such as to make its operation mandatory upon the employees in cases where the repairs are slight. We also think that there was sufficient evidence to sustain the verdict, and that James' testimony being corroborated by other witnesses, and he not being impeached by any method known to the law, this is not a case for the operation of the mere scintilla evidence rule, but is a case of conflicting testimony about which reasonable men might differ, or about which different reasonable conclusions might be drawn.

We think, therefore, it was for the jury's decision, and that the jury's decision is conclusive upon the facts.

The instruction given for the plaintiff is complained of, reading as follows: "The court instructs the jury for the plaintiff that this suit is brought under and is governed by an act of the United States Congress known as the Federal Employers' Liability Act, which provides that every common carrier by railroad, while engaging in commerce between any of the several states or territories, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of death of such employee, to his or her personal representative, for the benefit of the surviving widow and children of such employee, for such injury or death, resulting in whole or in part from negligence of any of the officers, agents or other employees of such carriers, or by reason of any defect or insufficiency, due to its neligence in its cars, engines, appliances, roadbeds, etc."

We do not think this instruction constitutes reversible error. We have examined all the instructions given, and have considered them as a whole, as we must do, and we think they present an adequate and fair announcement of the law, applicable to the facts in the case.

We do not think there is any error herein, and that the judgment of the court below must be affirmed.

Affirmed.